UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: _____

THE GOURMET CRAB INC.,

                   Plaintiff,                       **<u>JURY TRIAL DEMANDED</u>**

v.

D&D SEAFOOD CORPORATION,
BSC FISHERIES LLC,
BILLY'S STONE CRABS, INC.
BRIAN C. HERSHEY,
DENNIS DOPICO,
MARIO ROBIN DOPICO, and
GEORGE TERUEL,

                  Defendants.
_____/

## <u>COMPLAINT</u>

**(Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1)**

**(Violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19)**

**(Violation of Florida Deceptive & Unfair Trade Practices Act, Fla Stat. § 501.204)**

**(Declaratory and Injunctive Relief for Violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 and Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §26)**

**(Civil Conspiracy)**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................4

PARTIES ...........................................................................................................8

I.  Plaintiff ........................................................................................................8

II. Defendants ...................................................................................................8

      A. D&D Seafood Corporation Defendant.......................................................8

      B. BSC Fisheries LLC Defendant................................................................8

      C. Billy's Stone Crabs, Inc. Defendant.........................................................9

      D. Brian C. Hershey Defendant.................................................................9

      E. Dennis Dopico Defendant....................................................................9

      F. Mario Robin Dopico…...........................................................................9

      F. George Teruel….................................................................................9

III. Agents and Co-Conspirators ...........................................................................9

JURISDICTION AND VENUE…...........................................................................11

INTERSTATE COMMERCE AND VERTICAL INTEGRATION OF MARKET....................12

FACTUAL ALLEGATIONS ...............................................................................13

I.  Florida Keys Area Stone Crab Industry ...........................................................13

II. Defendants' Price-Fixing Cartel ....................................................................13

    A. Defendants' Cartel Arose Out of a Marked Increase in Stone Crab Ex Vessel
Prices Being Paid to Fish Houses and Fishermen in the Florida Keys Area that Started
in 2023/2024 Season and Continued Through the 2024/25 Season ................................14

    B. Defendants Agreed to Set the Opening Price, which they then lowered the price
for stone crab several times during the Large Portion of the Season's Catch and then
constantly setting a lower agreed Baseline Price for the Remainder of the Season….......19

    C. After the Opening, Defendants Closely Coordinate With One Another on Ex Vessel
Prices ....................................................................................................21

    D. Defendants Have Consolidated Their Control of the Florida Keys Area Ex Vessel
Stone Crab Market …..............................................................................22

E. In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Fish Houses and Fishermen who sell Stone Crab Ex-Vessel for Prices Higher than the Cartel Price..................................................................................................22

F. Defendants' purchase and distribution of stone crabs and spiny lobsters from Plaintiff and others similarly situated affected were within the flow of, and substantially affected, interstate trade and commerce.................................24

ANTITRUST INJURY........................................................................................25

DELAYED DISCOVERY/FRAUDULENT CONCEALMENT ...............................................26

CLAIMS FOR RELIEF .......................................................................................28

FIRST CAUSE OF ACTION ...............................................................................28
(Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1)

SECOND CAUSE OF ACTION ............................................................................30
 (Violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19)

THIRD CAUSE OF ACTION ...............................................................................31
(Violation of Florida Deceptive & Unfair Trade Practices Act, Fla Stat. § 501.204)

FOURTH CAUSE OF ACTION...................................................................33
(Declaratory and Injunctive Relief for Violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 and Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §26)

FIFTH CAUSE OF ACTION.......................................................................33
CIVIL CONSPIRACY (All Defendants)

PRAYER FOR RELIEF..............................................................................34

DEMAND FOR JURY TRIAL....................................................................35

Plaintiff, The Gourmet Crab Inc. ("Plaintiff") alleges, on information and belief based upon the investigation of counsel, except where based on personal knowledge, against Defendants D&D Seafood Corporation, BSC Fisheries LLC, Billy's Stone Crab Inc., Brian C. Hershey, Dennis Dopico, Mario Robin Dopico, and George Teruel which collectively do business and are commonly known as purchasers of stone crabs and spiny lobsters in South Florida (collectively, "Defendants"), as follows:

## <u>INTRODUCTION</u>

1.      Plaintiff The Gourmet Crab Inc. ("Plaintiff"), is a Florida corporation licensed to do business in the State of Florida and licensed by the Florida Wildlife Commission to engage in the purchase and wholesale of spiny lobsters and stone crabs in the State of Florida. Plaintiff's principal place of business and operations is located at 74580 Overseas Hwy, Islamorada, FL 33036.

2.      Since 2011, Plaintiff has been purchasing spiny lobsters and stone crabs from numerous fishermen as they arrived at Plaintiff's dock located on Overseas Hwy, Islamorada, FL 33036.

3.      In recent decades, the stone crab and spiny lobster fisheries have become the most important industry for Florida Keys area commercial fishermen, fish houses and the families and communities that depend on them.

4.      In the mid-2000s, the prices paid by Defendants and other buyers to Plaintiff for its stone crab and spiny lobsters -- what is referred to in the fishing industry and herein as the "ex vessel price," which means the price off the boat—started to climb as increased demand for lobsters in Asia and stone crab domestically and elsewhere translated into higher ex vessel prices.

4

5.      Defendants were/are distributors of stone crab and acting as such when purchasing stone crab from Plaintiff for subsequent sale of said stone crab throughout Florida and in the United States to hotels, restaurants and consumers who enjoy the stone crabs.

6.      While Defendants do not risk their lives on the Gulf of America in catching stone crabs and lobsters, Florida Keys area fishermen of all types face inherent dangers, including:

- **Accidents and injuries:** Working on a boat with heavy equipment can lead to injuries from falls, cuts from fishing hooks and lines, and being struck by gear.

- **Weather:** Sudden changes in weather conditions can create dangerous seas, particularly during Florida's hurricane season, when fishermen can face severe storms.

- **Navigation:** Navigating through potentially hazardous channels and around other vessels is a constant risk.

7.      Both the stone crab and spiny lobster fisheries in the Florida Keys Area rely on setting and retrieving traps. This specific work carries several risks:

- **Heavy and unwieldy traps:** Commercial fishermen use many heavy traps, which can be difficult to pull up from the seafloor. This poses a high risk of back injuries or being pulled overboard, especially in choppy water.

- **Lost traps during storms:** Storms and hurricanes can displace and scatter traps over large distances, making them difficult and dangerous to retrieve.

- **Entanglement:** Trap lines can become entangled with other vessels' propellers or snared on coral heads, creating hazards for fishermen.

- **"Ghost fishing" traps:** Traps that are lost can continue "ghost fishing," or capturing and killing marine life, including crabs and lobsters.

8.     Defendants do not go into debt to pay for boats and hundreds of thousands of dollars of gear. Defendants do not catch the stone crabs or spiny lobsters.

9.     Rather, for the most part, Defendants simply write a check to Plaintiff and others similarly situated, have someone truck and/or fly the crabs to retail outlet customers like food stores, hotels or restaurants.

10.     Nonetheless, in advance of the 2018/2019 stone crab season and continuing through the 2024/2025 stone crab season, Defendants formed a cartel of Florida Keys area stone crab buyers that had the purpose and effect of driving down the ex-vessel price of stone crabs in the Florida Keys area, so that the Defendants could earn higher profits. . . so they were able to make even more money than the fish house, like Plaintiff, and the fishermen, all doing the hard work.

11.     As detail alleged herein, Defendants created a pricing cartel which artificially fixed, depressed, and controlled the ex-vessel price paid to Plaintiff and others similarly situated in the Florida Keys area since the beginning of the 2018/2019 season and continuing through 2025, through the employment of a variety of means, including, without limitation:

   a.   agreeing not to compete with each other on the price offered to crabbers at the opening of the stone crab season, instead, agreeing to a set price for all Defendants at artificially low levels;

   b.   coordinating the ex-vessel prices they pay to fish houses and fishermen in the Florida Keys Area as the season progresses;

   c.   policing compliance by Defendants and other buyers with the artificially low ex vessel price set by the cartel;

12.     These factual allegations are based on interactions between Plaintiff and Defendants from 2018 through 2025 as well as *inter alia* on text messages and other documents filed in the federal criminal prosecution of Defendant Dennis Dopico in *United States v. Dennis Dopico*, No. 1:25-cr-20393-CMA (S.D. Fla.) (case pending sentencing) for violating the federal antitrust laws.

13.     Defendants' acts and meeting of the minds constituted a violation of the Anti-Trust laws under the Sherman Act for price fixing – federal criminal charges which were filed on September 10, 2025 and six days later Defendant Dennis Dopico pleaded guilty to the criminal information and Factual Plea Statement presented by the government to the federal district judge presiding over that criminal case, and other information and statements made by certain Defendant(s) in this case. *See Exhibit 1 hereto which is incorporated herein*.

14.     Defendants' actions as alleged herein constitute a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19, and violation of Florida Deceptive & Unfair Trade Practices Act, Fla Stat. § 501.204.

15.     Plaintiff respectfully seek remedies for Defendants' illegal antitrust conduct including compensation for its injuries suffered as a result, including treble damages and costs and attorney's fees as well as appropriate injunctive relief.

## PARTIES

### I.    Plaintiff

16.    The Gourmet Crab, Inc., is a Florida corporation which maintains its office and operations at 74580 Overseas Highway, Islamorada, FL 33036.

### II.    Defendants

#### A.    D&D Seafood Corporation

17.    D&D Seafood Corporation is a Florida corporation which maintains its office at 2772 N.W. 24th St., Miami, FL 33142 and 38 Coco Plum Drive Marathon, FL 33050.

18.    Defendant Dennis Dopico, who served as vice-president of D&D Seafood Corporation, previously served as president. Mario Robin Dopico currently serves as president, with George Teruel serves as secretary. The three rotate on a weekly basis from Miami to the Florida Keys supervising corporation affairs in those areas.

19.    The Registered Agent name and address for D&D Seafood Corporation is Mario Robin Dopico, 2771 N.W. 24th St., Miami, FL 33142.

#### B.    BSC Fisheries LLC

20.    BSC Fisheries LLC is a Florida business entity which maintains its office at 400 N. Ocean Dr., Hollywood, FL 33019.

21.    Corporate records maintained by the Florida Department of State, Division of Corporations show BSC Fisheries LLC to be the manager of Billy's Stone Crabs. Inc.

22.    The Registered Agent name and address for BSC Fisheries LLC is Ryan Shrouder, Esquire, 9800 Griffin Road, Cooper City, FL 33328.

    **C.**    <u>**Billy's Stone Crabs, Inc.**</u>

    23.    Billy's Stone Crabs, Inc., is a Florida corporation which maintains its office at 400 N. Ocean Dr., Hollywood, FL 33019.

    24.    The Registered Agent name and address for Billly's Stone Crabs, Inc., is Ryan Shrouder, Esquire, 9800 Griffin Road, Cooper City, FL 33328.

    **D.**    <u>**Brian C. Hersey**</u>

    25.    Corporate records maintained by the Florida Department of State, Division of Corporations show Brian C. Hersey, with an address of 400 N. Ocean Dr., Hollywood, FL 33019, to be the President and Director of Billy's Stone Crabs, Inc.

    **E.**    <u>**Dennis Dopico**</u>

    26.    Dennis Dopico served as vice-president of D&D Seafood Corporation with an address of 2771 NW 24th St. Miami, FL 33142. On information and belief, he resides at 8760 SW 87th St., Miami, FL 33173.

    **F.**    <u>**Mario Robin Dopico**</u>

    27.    Mario Robin Dopico served as president of D&D Seafood Corporation with an address of 2771 NW 24th St. Miami, FL 33142.

    **G.**    <u>**George Teruel**</u>

    28.    George Teruel served as secretary of D&D Seafood Corporation with an address of 2771 NW 24th St. Miami, FL 33142.

**III.**    <u>**Agents and Co-Conspirators**</u>

    29.    Various co-conspirators, some known and some unknown, willingly participated in and acted with Defendants in furtherance of the alleged conspiracy.

30.     Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein throughout the Florida Keys area and in the Southern District of Florida.

31.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

32.     At all relevant times, other known and unknown individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, among other things, joint ventures, and by acting as agents for principals in order to advance the objections of the scheme to benefit Defendants and themselves through the manipulation of ex vessel stone crab prices.

33.     Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's, corporation's, or other entity's business or affairs.

34.     The officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

35.     Each Defendant, and its respective subsidiaries, affiliates, and agents operated as a single unified entity.

36.     Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family. Individuals

within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Each Defendant's entities and their agents all affirmatively and collectively represent themselves as one respective corporate family, rather than separate subsidiaries and parents.

37.     Various persons, businesses, or fictitious persons not named as Defendants herein may have participated as co-conspirators in the scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as defendants at a later date.

## JURISDICTION AND VENUE

38.     The Court has jurisdiction over Plaintiff's claims for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

39.     This Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. §22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and because (1) Defendants are residents of the State of Florida and reside and/or maintain an office in the Southern District of Florida; (2) Defendants purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction and (3) because Plaintiff's claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiff suffered antitrust injury within this jurisdiction.

40.     Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

41.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

**INTERSTATE COMMERCE AND VERTICAL INTEGRATION OF MARKET**

42.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff. Defendants, directly and through their agents, engaged in activities affecting South Florida, that were designed to fix prices, unreasonably restrain trade, and adversely affect competition in ex vessel stone crab market.

43.     The pinnacle of the stone crab retail/restaurant industry is widely considered to be Joe's Stone Crab in "South Beach," Miami, Florida. This establishment shows the interstate aspect of the stone crab industry with branches in Las Vegas, Nevada; Chicago, Illinois; and Washington, D.C., in addition to the flagship Miami, Florida.

44.     The Joe's Stone Crab enterprise maintains an internet presence which, at the time of the filing of this complaint, presents a "Dinner Market Price Card" for the Las Vegas, Nevada restaurant with Florida Stone Crab. It notes that "Limited Quantities [are] Available," and that they are "Served Chilled with Joe's Mustard Sauce." The listed prices are: medium for $79.95, select for $89.95, and large for $99.95.

45.     Due to Joe's Stone Crab's long dominance of the retail/restaurant market for stone crabs, the fish houses in Marathon and Everglades City which supply Joe's are generally known and constitute vertical integration of the stone crab market from vessel to dinner plate. However, the public record does not disclose whether this vertical integration has a legal basis.

46.     Billy's Stone Crab Restaurant, a restaurant in Hollywood, Florida, also maintains an internet presence which, at the time of the filling of this complaint, did not list dinner prices for stone crab, declaring "Market Price." However, the mail order retail business listed prices per pound of stone crab as medium for $35.00, select for $41.00, and large for $47.00. While Billy's Stone Crabs' internet presence does not declare interstate outlets, it presents the claim that: "Our fresh seafood is available for delivery nationwide."

47.     Billy's Stone Crab Restaurant in Hollywood, Florida occupies the retail/restaurant top of a vertically integrated business enterprise from landing of the stone crab at the fish house on Summerland Key, Monroe County, Florida, to the dinner plate in the restaurant. Defendants BSC Fisheries, LLC, and Billy's Stone Crabs, Inc., are registered with the Florida Department of State showing the same business address, officers and registered agent.

48.     The Defendants agreed to and enforced their illegal price for stone crab claws to fishermen to maintain the profit margins inherent in this differential between the ex vessel price and the ultimate price charged to the consumer.

## **FACTUAL ALLEGATIONS**

## I.     **Florida Keys Ex-Vessel Stone Crab Industry**

49.     The Florida Keys have a significant and economically vital stone crab industry, characterized by the harvesting of claws only to allow the crabs to regenerate and survive, making it a sustainable, non-lethal, fishery. The industry contributes millions of dollars to the state's economy, with claws commanding high prices due to their luxury status, limited supply, and short harvesting season. Regulations, set by the Florida Fish and Wildlife Conservation Commission (FWC), govern the minimum claw size and trap requirements to ensure the fishery's future viability.

II.     **Defendants' Price-Fixing Cartel**

**A. Defendants' Cartel Arose Out of a Marked Increase in Stone Crab Ex-Vessel Prices Being Paid to Fish Houses and Fishermen in the Florida Keys Area that Started in 2018/2019 Season and Continued Through the 2024/25 Season** .

50.     In 2011, Plaintiff entered into the stone crab industry by the operation of a fish house as well as pushing out or dropping stone crab traps off the coast of the Florida Keys area.

51.     From the 2011/2012 stone crab season and continuing through 2016/2017, Plaintiff's stone crab business grew year after year, realizing substantial profits to its business and growth in the stone crab industry. Plaintiff was able to grow his business by obtaining more and more fishermen to off load their entire stone crab catch to Plaintiff by paying on the spot for the stone crabs at a good price per pound to the fishermen.

52.     Just prior to the 2017/18 stone crab season, Defendant Dennis Dopico met with Plaintiff's owner/president Owen Marimon in the Florida Keys, telling Plaintiff/Mr. Marimon that D&D Seafood would buy all of Plaintiff's stone crab for a price of $8.00 for medium, $14 for large $22 for jumbo and $24 per colossal per pound, a price which was fair and competitive in the Florida Keys Area. Defendant Dennis Dopico told Mr. Marimon that Plaintiff needed to sell all its stone crab to Defendant D&D Seafood.

53.     However, unbeknownst to Plaintiff, Defendant D&D Seafood and other Defendants had agreed with one another that neither would compete or purchase stone crabs from each other's client or customer fish houses.

54.     At the end of the 2017/2018, Plaintiff sold approximately 32,618.8 lbs. of stone crabs to Defendant D&D Seafood, which Defendant D&D Seafood paid Plaintiff approximately $527,468.00 for the 32,618.8 lbs. of stone crabs.

55.     At the beginning of 2018/2019 stone crab season, Defendant Dopico told Mr. Marimon that D&D Seafood could not pay the same price per pound as in the 2017/2018 stone crab season. Rather, Defendant Dopico told Mr. Marimon the demand for stone crab by consumers and restaurants had dropped off significantly, resulting in a very low demand for stone crab. Defendant D&D Seafood offered Plaintiff the following price per pound of stone crab, $9.50 per pound for medium, $16.50 per pound for large, $22.50 per pound for jumbo, $26.50 per pound for colossal.

56.     However, Defendant Dopico claimed that stone crab demand had dropped significantly was false and/or misleading as the consumption of stone crab by restaurants, hotels and consumers had not decreased, but rather increased.

57.     Immediately after D&D Seafood made the above price per pound offer of stone crab to Plaintiff, Plaintiff began contacting the other Defendants BSC Fisheries LLC, Billy's Stone Crab Inc., Brian Hershey and other purchasers of stone crabs in the Florida Keys area to seek to sell Plaintiff's stone crabs to them.

58.     In each instance of contacting Defendants BSC Fisheries LLC, Billy's Stone Crab Inc., Brian Hershey and other purchasers of stone crabs in the Florida Keys Area, these Defendants asked Plaintiff who it sold its stone crabs to in the previous stone crab season (2017/2018). When Plaintiff told Defendants BSC Fisheries LLC, Billy's Stone Crab Inc., Brian Hershey and other purchasers of stone crabs in the Florida Keys Area, it had sold the all of its stone crabs to D&D Seafood, these Defendants told Plaintiff it would have to sell its stone crabs to Defendant D&D Seafood. Defendants refused to buy any of Plaintiff's stone crabs.

59.     Thereafter, Plaintiff had no distributer to sell his stone crabs other than Defendant D&D Seafood because of an agreement between Defendants and D&D Seafood not to compete

against each other, all to the detriment of Plaintiff and its business. However, during the 2020/2021 stone crab season, Defendant Hershey broke ranks for a moment and purchased a small amount of stone crab from Plaintiff.

60.     As a result of Defendants agreement with each other not to compete with one another and suppress the fair market price per pound of stone crab, Plaintiff was unable to offer a reasonable price per pound to Plaintiff's fishermen, resulting in a drastic decrease of purchasing and selling stone crabs to Defendant D&D Seafood.

61..     For example, Plaintiff purchased stone crabs from its fishermen and sold to D&D Seafood in the following stone crab seasons:

| Stone Crab Season | Weight sold | Total Paid by D&D Seafood |
|---|---|---|
| Oct 2017 thru May 2018: | 32,618.8 lbs. | $527,468 |
| Oct 2018 thru May 2019: | 17,140.7 lbs. | $320,764 |
| Oct 2019 thru May 2020: | 14,995.3 lbs. | $257,656 |
| Oct 2020 thru May 2021: | 15,782.1 lbs. | $293,573 |
| Oct 2021 thru May 2022: | 26,692.8 lbs. | $693,009 |
| Oct 2022 thru May 2023: | 25,504.8 lbs. | $608,670 |
| Oct 2023 thru May 2024: | 27,475.4 lbs. | $674,567 |
| Oct 2024 thru May 2025: | 25,213.3 lbs. | $523,524 |
| **Total:** | **185,423.2 lbs.** | **$3,896,231** |

62.     As evidenced by the above stone crab season in 2018/2019, Defendant D&D Seafood price fixing caused a 29.2% drop in revenue to Plaintiff.

63.     As evidenced by the above stone crab season in 2018/2019, Defendant D&D Seafood price fixing caused a 47.5% drop in weight of stone crab purchased by Plaintiff from the

16

fishermen. Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

64.     The Defendants' price fixing caused the fishermen to sell a small portion of their stone crab catch to Plaintiff since the fishermen docked their boats at Plaintiff's fish house. The fishermen either sold their stone crab catch directly to restaurants in the Florida Keys Area or to others for the suppressed price set by the Defendants.

65.     As evidenced by the above stone crab season in 2019/2020, Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel caused a 51.2% drop in revenue to Plaintiff. Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

66.     As evidenced by the above stone crab season in 2019/2020, Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel caused price fixing caused a 54.1% drop in weight of stone crab purchased by Plaintiff from the fishermen.

67.     As evidenced by the above stone crab season in 2020/2021, Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel caused price fixing caused a 44.4% drop in revenue to Plaintiff. Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

68.     As evidenced by the above stone crab season in 2020/2021, Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel caused price fixing caused a 51.7% drop in weight of stone crab purchased by Plaintiff from the fishermen.

69.     As evidenced by the above stone crab season in 2021/2022, Plaintiff generated more weight of stone crab due to Plaintiff acquiring more fishermen who sold crabs to Plaintiff.

70.     During the 2021/2022 stone crab season, Plaintiff sold more of the larger sizes of stone crabs to Defendant D&D Seafood resulting in a higher revenue number for Plaintiff in that stone crab season. However, Defendants' price fixing of stone crab market price at ex-vessel caused the prices of stone crab to be lower than if there was a free and competitive market.

71.     Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

72.     During the 2022/2023 stone crab season, Plaintiff sold more of the larger sizes of stone crabs to Defendant D&D Seafood resulting in a higher revenue number for Plaintiff in that stone crab season. However, Defendants' price fixing of stone crab market price at ex-vessel caused the prices of stone crab to be lower than if there was a free and competitive market.

73.     From the 2018/2019 stone crab season through 2024/2025 stone crab season, Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

74.     As evidenced by the above stone crab season in 2023/2024, Defendant D&D Seafood price fixing caused a 15.8% drop in weight of stone crab purchased by Plaintiff from the fishermen compared to 2017/2018 stone crab season.

75.     During the 2023/2024 stone crab season, Plaintiff sold more of the larger sizes of stone crabs to Defendant D&D Seafood resulting in a higher revenue number for Plaintiff in that stone crab season. However, Defendants' price fixing of stone crab market price at ex-vessel caused the prices of stone crab to be lower than if there was a free and competitive market. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

76.     As evidenced by the above stone crab season in 2024/2025, Defendant D&D Seafood price fixing caused a 22.8% drop in weight of stone crab purchased by Plaintiff from the fishermen compared to 2017/2018 stone crab season. Defendant D&D Seafood and Defendants' price fixing of stone crab market price at ex-vessel deprived Plaintiff of fair and competitive pricing. By Defendants colluding to set artificial prices, Defendant removed the ability for Plaintiff to negotiate the price of stone crab based on market supply and demand.

**B.     Defendants Agreed to Set the Opening Price, which they then lowered the price for stone crab several times during the Large Portion of the Season's Catch and then constantly setting a lower agreed Baseline Price for the <u>Remainder of the Season</u>**

77.     Critical to Defendants' conspiracy to artificially fix, control, and suppress ex vessel prices in the Florida Keys Area has been their agreement, during the conspiracy period, to allow a gradual lowering of the price per pound for stone crab in the Florida Keys Area, rather than offering competing prices. Indeed, Defendants not only refuse to pay any amount higher than the price dictated by D&D Seafood but they will also refuse to offer a price higher than D&D Seafood to fish houses when called for a competing price per pound for stone crab. or in

the case of Plaintiff refuse to offer any price since Plaintiff had sold stone crab to D&D Seafood the prior stone crab season.

78.     The lack of competition results in both (a) an artificially lower price at the start of each stone crab season starting from 2018/2019 and continuing through 2024/2025 season, which a large portion of stone crab caught in the season is sold and (b) the establishment of an artificially depressed baseline for prices throughout the season.

79.     As Defendants knew or should have known they could pay at least approximately $5.00 over what was paid per pound ex-vessel to fish houses at the opening of stone crab seasons in the Florida Keys Area, and still make a significant profit. Thus, basic economic logic would predict that, in an unmanipulated market, Defendants would compete with each other by offering fish houses like Plaintiff higher ex-vessel prices until this threshold was met.

80.     However, as a result of their illegal agreement not to compete with each other on Price of stone crabs, Defendants have forced Plaintiff and others similarly situated to accept far less than that, reaping huge illegal profits on the backs of the fish houses throughout each stone crab the season.

81.     Indeed, these illegal excess profits, in combination with the risks posed by punishments that Defendants impose on fish houses who refuse to comply with Defendants' pricing dictates, are so significant that owners of fish houses are in fear that none of the five company distributors (buyers) of stone crabs would buy any of their stone crabs, essentially bankrupting the fish houses. Thus, instead of offering a fair ex-vessel opening price that would allow both Defendants and Plaintiff and other fish houses to make a living, Plaintiff has lost the opportunity to sell stone crab during periods of peak demand when prices otherwise would and should have been at their highest.

**C.**     **After the Opening, Defendants Closely Coordinate With One Another on Ex-Vessel Prices**

82.     From the 2018/2019 stone crab season continuing through the 2024/2025 stone crab season, Defendants collectively and in concert with one another dropped the price of the stone crab per pound by approximately 10%-20% at least three times during each season.

83.     For example, in the 2023/2024 season, Defendant Dopico sent text messages to Defendant Brian Hershey regarding the setting and coordination of the price for stone crabs in the Florida Keys area.

84.     For example, on or about September 28, 2023, Defendant Dopico sent a text message to Defendant Brian Hershey presenting the prices Defendant Dopico and his company D&D Seafood were paying to fishermen for spiny lobster. Defendant Brian Hershey responded "ok thanks[,]" and the Defendant Dopico replied "[d]on't show text to anyone[.] Confidential[.]" Defendant Brian Hershey responded, "I give you my word. We're working together now[,] not against each other[.]"

85.     For example, on or about October 13, 2023, Brian Hershey texted the Defendant BSC Fisheries LLC 's stone crab claw prices: "Everglades city 14.50(,] 22.50(,] 34.00(, and] 37.00[.]" Defendant Dopico responded, " [L]et me know what you do. I am matching your prices. It's the one we like the most[.]" After Defendant Brian Hershey shared Defendant BSC Fisheries LLC 's prices, Defendant Dopico matched those prices. Defendant Dopico also engaged directly and indirectly with other individual managers of three other Florida Keys area company distributors/buyers of stone crabs and spiny lobsters regarding the prices at which those three company distributors/buyers would pay fishermen for stone crab claws and spiny lobsters, which Defendant Dopico often matched.

86.     For example, Mario Robin Dopico, and George Teruel would alternate weeks with Defendant Dennis Dopico in handling the purchasing of stone crabs from Plaintiffs and others similarly situated in the Florida Keys. In so doing, Mario Robin Dopico, and George Teruel enforced the price fixing scheme targeting Plaintiff.

### D. Defendants Have Consolidated Their Control of the Florida Keys Area Ex Vessel Stone Crab Market

87.     Defendants set the price of the stone crab for each season following the 2017/2018 stone crab season. The Defendants agreed to not compete with one another by agreeing to not purchase stone crabs from each other's clients, like Plaintiff.

88.     For example, when Defendant Dopico and D&D Seafood informed Plaintiff of the low set price to purchase Plaintiff's stone crabs, Plaintiff contacted Defendant Keys Fisheries to negotiate a better price offered by Defendants Dopico and D&D Seafood. Defendant Keys Fisheries asked Plaintiff who purchased its stone crab the previous stone crab season. When Plaintiff informed Keys Fisheries it was D&D Seafood, Keys Fisheries told Plaintiff to call D&D Seafood. When Plaintiff pressed Key Fisheries to make an offer to purchase Plaintiff's stone crabs, Key Fisheries then stated it didn't want to buy any stone crabs from Plaintiff.

### E. In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Fish Houses and Fishermen who sell Stone Crab Ex-Vessel for Prices Higher than the Cartel Price.

89.     In response to this price fixing by their fellow cartel members and to prevent non-cartel members from disrupting their agreement to fix ex vessel prices at an artificially low level, Defendants punish fish houses who sell to other buyers by refusing to purchase crab and other fish from such non-compliant fish houses.

90.     This tactic has the additional salutary effect for Defendants of assisting them in maintaining their share of the ex-vessel market without the need to raise ex-vessel prices to a level disallowed by the cartel.

91.     In a competitive market, Defendants would have to use higher ex vessel prices to maintain their market share—as the "service" they perform for fish houses (buying their crab) is fundamentally fungible. The principal variant is the price paid to the fisherman by the fish house. If Defendants competed with each other, they would end up offering higher and higher ex-vessel prices in competition with one another, and squeezing their profit margins (essentially the inverse of the "race-to-the-bottom" problem that often leads sellers of commodity products to enter into price-fixing arrangements).

92.     By agreeing to fix prices at an artificially low level, Defendants have protected their profit margin.

93.     Absent the market manipulation alleged herein, buyers would be in competition with each other for available stone crab. This competition would be competition in the price paid. Publicize its offer to pay a higher ex-vessel price to fish houses to lure more fish houses to sell to it. Economic logic would also predict that the increased sell-side demand created by such publication of the stone crab distributor's offer to pay more would, in turn, allow the stone crab distributor to ultimately lower its offered price, increasing its profits.

94.     This is especially the case in a situation such as that presented by stone crab distributor in the Florida Key area stone crab market where, like the product that fish houses are selling to stone crab distributor (freshly caught stone crabs), there is no meaningful difference between stone crab distributors beyond price.

95.     In a price-fixing cartel, there may be a strong incentive by cartel members to cheat, so as to both gain the benefit of the artificially depressed price created by the cartel but also to gain some advantage on their fellow cartel members. As alleged elsewhere herein, Defendants aggressively seek to police compliance with their agreed-upon pricing and to punish non-compliance.

**F.     Defendants' purchase and distribution of stone crabs and spiny lobsters from Plaintiff and others similarly situated affected were within the flow of, and substantially affected, interstate trade and commerce.**

96.     From at least in or around 2018/2019 stone crab season through at least in or around April 2025, Defendants knowingly and voluntarily joined and participated in a conspiracy with other persons and entities engaged in the purchase of stone crab claws and spiny lobsters in Florida, the primary purpose of which was to suppress and eliminate competition and fix the prices paid to fishermen for stone crab claw and spiny lobster harvests in Florida. In furtherance of the conspiracy, Defendants engaged directly and indirectly in discussions, communications, and meetings with representatives of other major purchasers of stone crab claws and spiny lobsters in Florida, including Defendants Brian Hershey and BSC Fisheries, Individual 3 (the manager for purchasing and sales for Company 3), Individual 4 (formerly the manager of purchasing and sales for Company 4), and Individual 5 (the manager of purchasing and sales for Company 5), to suppress and eliminate competition and fix the prices paid to fishermen for stone crab claws and spiny lobsters harvested in Florida.

97.     During the same period, stone crab claws and spiny lobsters purchased by one or more of the co-conspirator companies, equipment and supplies necessary to the distribution of stone crab claws and spiny lobsters, as well as payments for stone crab claws and spiny lobsters traveled in interstate commerce. The business activities of the coconspirators in connection with

the purchase of stone crab claws and spiny lobsters that were the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.

98.     Acts in furtherance of this conspiracy were carried out within the Southern District of Florida. The conspiratorial discussions, communications, and meetings described above took place in the United States, and at least one of these meetings, which was attended by the defendant, occurred in this District.

## ANTITRUST INJURY

99.     Prior to and/or in 2023 and continuing through 2025, Defendants' anticompetitive conduct had the following effects, among others, throughout the Florida Keys Area:

a. competition has been restrained or eliminated with respect to ex vessel prices paid to Plaintiff for Stone crab;

b. Plaintiff have been deprived the benefits of free and open competition for the purchase of its product;

c. ex-vessel prices paid for Stone crab in the Florida Keys Area have been fixed, lowered, stabilized, or maintained at artificially depressed levels; and

d. Plaintiff and others similarly situated were paid artificially depressed ex vessel prices for their sales of Stone crab.

100.    The purpose and effect of this anticompetitive course of conduct was to exclude competition and to lower, fix, or maintain the purchase price for ex vessel stone crab and spiny lobsters throughout the Florida Keys area. As a direct and foreseeable result, during the 2018/2019 stone crab season and continuing through the 2024/2025 stone crab season, Plaintiff was paid lower prices for the stone crab Plaintiff sold ex vessel than Plaintiff would have been paid in an unrestrained market.

101.     As noted above, ex vessel sales of stone crab in the Florida Keys Area during each of the above stone crab seasons have been largely affected by Defendants' conspiracy because that geographic area is dominated by Defendants.

102.     The artificial suppression of ex vessel Stone crab prices in the Florida Keys area affected not only sales made to Defendants but also those sales made to non-conspiring ex vessel purchasers. This is because non-conspiring ex vessel purchasers are disincentivized from offering higher prices for stone crab under cover of Defendants' fixed, artificially depressed prices. As a result, all sellers of ex vessel stone crab in the Florida Keys area—whether the transaction involves Defendants or non-Defendant purchasers—suffered harm during the conspiracy period from 2018 through 2025.

103.     By reason of the antitrust violations alleged herein, Plaintiff has sustained injury to its businesses or property, and as a result has suffered damages. Such injuries, which result from the price effects caused by Defendants' conduct, are precisely the type that the antitrust laws were intended to forestall.

## DELAYED DISCOVERY/FRAUDULENT CONCEALMENT

104.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiff.

105.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaging in the illegal and unlawful conduct as alleged herein until the news media published on September 10, 2025 the filing of criminal charges against Defendant Dennis Dopico by the United States Department of Justice Anti-Trust Division in the Southern District of Florida, Miami Division, shortly before this litigation was commenced. Specifically, Plaintiff only discovered the identity of the presently identifiable

participants in Defendants' scheme to fix prices, from which all of Plaintiff's claims derive, when the criminal information was filed in the criminal case of *United States v. Dennis Dopico*, No. 1:25-cr-20393-CMA (S.D. Fla.) (case pending sentencing) and documents filed by the government in said criminal case, which included the criminal information, the plea agreement and factual plea agreed to and entered into by Defendant Dopico under oath.

106.    Nor could Plaintiff, in the exercise of reasonable diligence, have discovered the violations earlier than that time because Defendants secretly engaged in their wrongdoing, concealing the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

107.    For example, Defendants substantially memorialized their agreements concerning pricing orally and via text messages sent and received on the personal devices of Defendants' employees, principals, and owners. Furthermore, these discussions were held in private in order to prevent discovery of the conspiracy by Plaintiff.

108.    Plaintiff could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' active and purposeful concealment of their unlawful activities.

109.    As a result of Defendants' fraudulent concealment of their wrongful acts, Plaintiff's delayed discovery of those wrongful acts, and the continuing nature of Defendants' conspiracy, Plaintiff asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1
### (Conspiracy to Fix Prices of Stone Crab)
**(Against All Defendants)**

110.    Plaintiff realleges and incorporates by reference the allegations above 1 through 109 as though fully set forth herein.

111.    Beginning no later than the start of the 2018/2019 stone crab season and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.    This agreement, understanding, and conspiracy has included concerted action and undertakings by Defendants and their co-conspirators with the purpose and effect of: (a) fixing, lowering, and stabilizing ex-vessel prices for stone crab and spiny lobsters in the Florida Keys area at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators with regards to ex-vessel stone crab and spiny lobster prices in the Florida Keys area.

113.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, lowering, and stabilizing of ex vessel prices of Stone crab in the Florida Keys area.

114.    The acts done by Defendants and their co-conspirators as part of, and in furtherance of, their agreement, understanding, and conspiracy were authorized, ordered, or done

28

by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

115.     The unlawful agreement, understanding, and conspiracy among Defendants and their co-conspirators have had the following effects, among others:

a. competition in the Florida Keys area among Defendants, their co-conspirators, and other ex-vessel buyers of stone crab has been suppressed, restrained, and eliminated;

b. ex-vessel prices for stone crab have been fixed, lowered, maintained, and stabilized at artificially low levels throughout the Florida Keys area; and

c. Plaintiff and other fish houses who sold stone crab ex vessel in the Florida Keys area have been deprived of the benefits and free and open competition.

116.     As a result, during the 2018/2019 stone crab season and continuing to the 2024/2025 stone crab season, Plaintiff has received lower prices for its stone crab from Defendants, their co- coconspirators, and other ex-vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

117.     Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiff has suffered injury to its property.

118.     Defendants' contract, combination, and conspiracy is a *per se* violation of Section 1 of the Sherman Act.

119.     As a proximate result of the acts of Defendants targeting Plaintiff, Plaintiff has been damaged in excess of $2,781,348.00.

29

120.    Plaintiff is entitled to recover treble damages against Defendants, jointly and severally, plus attorney's fees and costs incurred by Plaintiff.

## SECOND CAUSE OF ACTION

## Violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19

### (Against All Defendants)

121.    Plaintiff realleges and incorporates by reference the allegations above 1 through 109 as though fully set forth herein.

122.    Defendants have entered into an unlawful combination in restraint of trade in violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19 during the 2018/2019 stone crab season and continuing to the 2024/2025 stone crab season, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each Defendant has acted in violation of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19 to fix, stabilize, and maintain ex vessel prices for stone crab throughout the Florida Keys Area, including in Florida.

123.    The violations of Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, maintain, and stabilize ex vessel prices for stone crab in Florida. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and fixing, lowering, and stabilizing the ex-vessel price of stone crab in Florida.

124.    Defendants' combination and conspiracy had the following purpose and effects: (1) ex vessel price competition for Stone crab was restrained, suppressed, and eliminated

throughout Florida Keys area; (2) ex vessel stone crab prices in Florida Keys area were fixed, lowered, maintained, and stabilized at artificially low levels; and (3) Plaintiff and other fish houses have been deprived of free and open competition in the ex-vessel stone crab market in Florida Keys area. During the during the 2018/2019 stone crab season and continuing to the 2024/2025 stone crab season, Defendants' illegal conduct substantially affected Florida commerce and consumers. These anticompetitive effects outweigh any beneficial effect on competition.

125.    As a result, during the 2018/2019 stone crab season and continuing to the 2024/2025 stone crab season, Plaintiff has received lower prices for its stone crab from Defendants, their co-conspirators, and other ex-vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

126.    Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiff has suffered injury to its property.

127.    As a proximate result of the acts of Defendants targeting Plaintiff, Plaintiff has been damaged in excess of $2,781,348.00.

128.    Plaintiff is entitled to recover treble damages against Defendants, jointly and severally, plus attorney's fees and costs incurred by Plaintiff.

### **THIRD CAUSE OF ACTION**

### **Violation of Florida Deceptive & Unfair Trade Practices Act, Fla Stat. § 501.204**
**(Against All Defendants)**

129.    Plaintiff realleges and incorporate by reference the allegations above 1 through 109 as though fully set forth herein.

130.    Defendants have intentionally and wrongfully engaged and continue to engage in

the practices above, which are unlawful, fraudulent, and/or constitute unfair competition within the meaning of section 501.204 of the Florida Deceptive and Unfair Trade Practices Act.

131.    These practices include but are not limited to:

a. Defendants' combination and agreement to fix, lower, maintain, and stabilize ex-vessel stone crab prices in Florida Keys area and South Florida, and to control the stone crab prices throughout the seasons; and

b. Defendants' efforts to police and enforce their combination and agreement, and to punish or coerce compliance from those ex-vessel stone crab purchasers who have not joined Defendants' combination and conspiracy.

132.    The purpose and effect of these practices is to harm competition and suppress ex vessel prices for stone crab in Florida.

133.    Plaintiff suffered harm including but not limited to financial loss and loss profits as a direct and proximate result of Defendants' practices as described above.

134.    The practices alleged above are unfair, irrespective of the violation of any other law, and constitute unfair competition within the meaning of section 501.204 of the Florida Deceptive and Unfair Trade Practices Act. They are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and the harm caused by such practices—including in the form of artificially depressed ex vessel prices for stone crab—greatly outweighs any possible utility therefrom.

135.    Plaintiff is entitled to Judgment against Defendants and in favor of Plaintiff and an award all damages, prejudgment interest, costs, attorney's fees, civil penalties and for such other and further relief as the Court deems just and equitable.

## FOURTH CAUSE OF ACTION

**Declaratory and Injunctive Relief for Violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 and Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §26**

136.    Plaintiff hereby repeat and incorporate by reference paragraphs 1 through 109 as though fully set forth herein.

137.    Defendants' Sherman Act conspiracy is ongoing, and the injuries alleged herein will continue unless enjoined.

138.    Plaintiff, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201(a), hereby seeks a declaratory judgment that Defendants' conduct constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

## FIFTH CAUSE OF ACTION

### CIVIL CONSPIRACY
### (All Defendants)

139.    Plaintiff hereby repeat and incorporate by reference paragraphs 1 through 109 as though fully set forth herein.

140.    A civil conspiracy, in Florida, consists of the following elements: "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship,* 931 So.2d 137, 140 (Fla. 5th DCA 2006).

141.    Defendants D&D Seafood Corporation, BSC Fisheries LLC, Billy's Stone Crabs Inc., on the one hand, and Defendants Brian Hershey, Dennis Dopico, Mario Robin Dopico, and George Teruel on the other hand, engaged in a conspiracy, the object of which was to fix

artificially lower prices on the stone crabs and/or eliminate the ability of Plaintiff to negotiate prices with other distributors/buyers of stone crabs.

142.    Defendants had a "meeting of minds" on the goal of price fixing of stone crabs and/or depriving Plaintiff of the ability to negotiate for a better price for stone crabs, and/or demand for stone crabs as well as a "meeting of the minds" in the particular course of action required to accomplish that goal.

143.    In furtherance of the above-described conspiracy, and to affect its objectives, the Defendants in the conspiracy committed and agreed to commit overt acts or have others commit overt acts on their behalf in the Southern District of Florida and elsewhere.

144.    Defendants D&D Seafood Corporation, BSC Fisheries LLC, Billy's Stone Crabs Inc., on the one hand, and Defendants Brian Hershey, and Dennis Dopico, on the other hand, committed one or more unlawful overt acts toward accomplishing their goal.

145.    Plaintiff suffered damages as the proximate result thereof, an amount in excess of $2,781,348.00.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff prays as follows:

A.    That Defendants' conduct specified in this Complaint be declared by the Court to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the Florida Antitrust Act, Fla. Stat. §§ 542.18, 542.19; and the Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.204.

B.    That judgment be entered for Plaintiff against Defendants for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this

action, including reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26, and the Florida Antitrust Act, Fla. Stat. § 542.22;

      C.    That Plaintiff be awarded pre-judgment and post-judgment interest at the highest

legal rate from and after the date of service of this Complaint to the extent provided by law;

      D.    That the Court issue further equitable relief in the form of a permanent injunction

prohibiting Defendants' exclusionary agreements and other ongoing and future exclusionary

conduct; and

      E.    That Plaintiff receives such other, further, or different relief as the case may

require and the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

      146.    Plaintiff demands a jury trial of all issues so triable.

Miami, Florida                    Respectfully submitted,

                                **LAW OFFICES OF ANDRE A. ROUVIERE**
4070 Laguna Street
Coral Gables, Florida 33146
Tel: (305)774-7000
Fax:(305)946-6121
email: andre@rouvierelawfirm.com

*//ss// Andre A. Rouviere*
ANDRE A. ROUVIERE
Florida Bar No. 826073

**WILLIAM M. NORRIS, P.A.**
134 Key Heights Drive
Tavernier, FL 33070
Tel: (305) 972-5732
e-mail: wnorrislaw@aol.com

*//ss// William M. Norris*
William M. Norris
Florida Bar No. 0309990

*Attorneys for Plaintiff.*

35